UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALLIE M.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-01623-MJD-TWP |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Claimant Allie M. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. *See* 42 U.S.C. § 423(d); 42 U.S.C. § 1382.[2] For the reasons set forth below, the Court **REVERSES** the decision of the Commissioner.

**I. Background**

Claimant applied for DIB and SSI in May 2018, alleging an onset of disability as of January 27, 2018. [Dkt. 18-5 at 2, 10]. Claimant's applications were denied initially and again

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.
[2] Claimant identifies as a woman and began her transition in 2016. She prefers she/her pronouns. Out of respect for Claimant, any masculine pronouns found in the record have been replaced without noting a bracketed modification.

upon reconsideration, and a hearing was held before Administrative Law Judge Timothy Turner ("ALJ") on June 30, 2020. [Dkt. 18-2 at 33.] On July 16, 2020, ALJ Turner issued his determination that Claimant was not disabled. [Dkt. 18-2 at 14.] The Appeals Council then denied Claimant's request for review on April 6, 2021. [Dkt. 18-2 at 2.] On June 10, 2021, Claimant timely filed her Complaint in this Court seeking judicial review of the ALJ's decision. [Dkt. 1.]

## II.  Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423.[3] Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 CFR pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform her past relevant work, she is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform her past relevant work, but can perform certain other available work, she is

---

[3] DIB and SSI claims are governed by separate statutes and regulations that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to those that apply to DIB.

2

not disabled. 20 CFR § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)).

In reviewing a claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). While an ALJ need not address every piece of evidence, he "must provide a 'logical bridge' between the evidence and his conclusions." *Varga*, 794 F.3d at 813 (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010)). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether the claimant is disabled. *Id.*

### III.  ALJ Decision

ALJ Turner first determined that Claimant had not engaged in substantial gainful activity since her alleged onset date of January 26, 2018. [Dkt. 18-2 at 19.] At step two, the ALJ found that Claimant had the following severe impairments: "inflammatory bowel disease (IBD), obesity, and migraines." *Id.* at 20. The ALJ determined that Claimant's diverticulosis, fatty liver disease, hypertension, obstructive sleep apnea, gender dysphoria, depression, anxiety, and PTSD were non-severe. *Id.* At step three, the ALJ found that Claimant's impairments did not meet or

medically equal a listed impairment during the relevant time period. *Id.* at 21. ALJ Turner then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, frequently stoop, frequently kneel, frequently crouch, and frequently crawl. She can never work at unprotected heights, with moving mechanical parts, or operate a motor vehicle, can have occasional exposure to fumes, odors, dusts and pulmonary irritants, and can tolerate moderate noise.

*Id.* at 22.

At step four, ALJ Turner found that Claimant was capable of performing her past relevant work as a Pharmacy Technician, and that such work did not require the performance of work-related activities precluded by the above RFC. *Id.* at 25. The ALJ then made the "alternative finding" that there are other jobs existing in the national economy that Claimant can perform, such as mail clerk (DOT 209.687-026), general office helper (DOT 239.567-010), and sales clerk (DOT 299.677-010). *Id.* at 26-27. Accordingly, ALJ Turner concluded that Claimant was not disabled. *Id.* at 27.

### IV. Discussion

Claimant advances three arguments in support of her request to reverse ALJ Turner's decision. She argues that the ALJ erred by (1) failing to account for limitations resulting from Claimant's severe migraines; (2) inappropriately weighing the consultative examining psychologist's opinion; and (3) improperly assessing Claimant's subjective symptoms. [Dkt. 25.] In response, the Commissioner asserts that Claimant has not established that remand is required on any of the three issues presented. [Dkt. 26.] As discussed in detail below, the Court agrees with Claimant that ALJ Turner's decision is deficient and therefore must be reversed.

A. **The ALJ Erred by Failing to Articulate Whether Claimant's Severe Migraines Resulted in Limitations**

Claimant first argues that ALJ Turner erroneously failed to account for relevant limitations associated with Claimant's migraines, despite finding them to constitute a severe impairment. [Dkt. 25 at 7.]

Claimant has suffered from migraines since she was a teenager, although they became debilitating around 2007. [Dkt. 18-2 at 57-58.] The record illustrates that, in November 2018, Claimant was experiencing migraines once per month that lasted anywhere from two-to-four hours to days. [Dkt. 18-7 at 215.] Symptoms included "bilateral head pain with blindness in the left visual field" and "aura of 'sparkles' in vision," and she was referred to a neurologist by her primary care physician. *Id.* at 215, 218. By January 2019, Claimant's migraine frequency had increased to once per week, and they were lasting for four-to-five hours. *Id.* at 330-31. Symptoms included visual aura and language disturbance, and the migraines were only resolved with rest. *Id.*

On February 7, 2019, Claimant met with neurologist Evan Templeton, MD, for an evaluation of her migraines. [Dkt. 18-7 at 372.] Dr. Templeton documented that Claimant's migraines occurred once or twice per week, lasted four-to-five hours, and were "pretty intense." *Id.* Symptoms included "sharp, crushing pain," sensitivity to light and sound, "left field of vision goes dark/static," difficulty speaking, and some difficulty understanding. *Id.* On May 31, 2019, Dr. Templeton documented that Claimant's migraines now occurred "three times per week," lasted four-to-five hours, and were still "pretty intense." [Dkt. 18-8 at 97.] Symptoms included "sharp, crushing pain," sensitivity to light and sound, "left field of vision goes dark/static," difficulty speaking, and some difficulty understanding. *Id.* at 97-98. Then, in September 2019, Dr. Templeton noted that Claimant was experiencing "15 migraines per month." *Id.* at 117. Dr.

5

Templeton diagnosed Claimant with "intractable migraine with aura" and referred her to the Botox Clinic for treatment. *Id.* at 119.

Claimant received her first Botox injection from Jaison Grimes, MD, on October 14, 2019. [Dkt. 18-8 at 124.] Dr. Grimes confirmed that Claimant "has 15 or more migraines per month and she has failed multiple medications." *Id.* On February 7, 2020, Dr. Grimes noted that Claimant "only had 4 significant headaches per month" since her initial Botox injection, and he administered another injection that day. *Id.* at 230. On February 17, 2020, neurologist Joshua East, MD, reported that Claimant's "[m]igraines are little bit better on Botox, though still having approximately 12 per month. The migraines are of less intensity than the[y] had been previously. Overall she does wish to continue with the Botox." *Id.* at 232.

At her hearing on June 30, 2020, Claimant testified that her "frequent migraines" cause "sudden blindness in my left eye, in the left field of vision, and an inability to understand or speak English." [Dkt. 18-2 at 45.] Claimant testified she was experiencing migraines "about two-to-four times a week." *Id.* at 55. She noted that, when receiving Botox injections every three-to-four months, her migraine occurrence "was down to about twice a week," but she was forced to stop treatment once the pandemic hit due to being high-risk for contracting COVID-19. *Id.* at 55. Claimant described an average headache, pre-Botox treatment, as follows:

> It was a sharp pain on the left side of my head. It would just come on very slowly like a dull ache, usually, but sometimes it could be lightning fast. And primarily, it would come on as a dull ache and I would have, probably, maybe 15 to 20 minutes at most before it would result in sparking lights on the left field of vision and if I did not get the Imitrex in my system right when that started, I would have to basically, spend the rest of the day in my bedroom with the lights off, no sound, no noise from outside, anything. I would go completely blind in the left eye. The left field of vision was just static, and I would lose the capability frequently to understand written or spoken English.

*Id.* at 56-57. She continued:

> After the [Botox] treatment, as long as I get, I was getting some kind of, like, NSAID or something, like an Excedrin Migraine, something in my system to keep it from getting worse—it would just be a really muddy headache, hard to concentrate. The medication usually made me throw up after about 30 minutes because my stomach can't really handle that. But I would still have to, you know, turn the lights off, lay down for a couple of hours, rest, not do anything, not talk to anybody, and I cannot imagine trying to go into work like that.

*Id.* at 57. Claimant testified that she takes Naproxen "whenever I'm feeling the onset of a migraine. So, currently I would say three-to-four times week." *Id.* at 47. She also takes Imitrex, although she testified that "I don't take it nearly as often as I should because my insurance only pays for nine tablets a month. . . . So, I try to limit it to once or twice a week at most." *Id.* Claimant further testified that she "was on regular disciplinary action as a result of having these migraines." *Id.* at 58. For example, while working at Kroger, her migraines caused her to miss "four days in a row of work." *Id.*

Here, after finding that Claimant was severely impaired by her migraines, *see* [Dkt. 18-2 at 20], ALJ Turner determined that Claimant could

> occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, frequently stoop, frequently kneel, frequently crouch, and frequently crawl. She can never work at unprotected heights, with moving mechanical parts, or operate a motor vehicle, can have occasional exposure to fumes, odors, dusts and pulmonary irritants, and can tolerate moderate noise.

[Dkt. 18-2 at 22.] The ALJ then briefly summarized some of Claimant's medical records regarding migraines and stated that,

> [a]lthough the claimant has received treatment for the allegedly disabling impairment(s), that treatment has been essentially routine and/or conservative in nature, consisting primarily of medications. There is no indication the claimant required any surgery or inpatient hospitalizations as the result of her impairments. Moreover, the medical records reveal that the medications and treatment have been relatively effective in controlling the claimant's symptoms. As noted above, the claimant testified that her migraines were controlled with Botox, which is also reflected in the records, and notes show she reported that pain symptoms improved with diet changes (Exs. 14F, 13F, 10F, 1F, 3F).

*Id.* at 25. ALJ Turner concluded that "additional limitations are not warranted in light of the claimant's overall conservative treatment, and her reports of improvement with Botox." *Id.* Ultimately, this assessment of Claimant's migraines is erroneous for two overarching reasons.

First, Claimant is correct that the ALJ did not articulate any relevant limitations to account for migraines in the RFC assessment, nor did he offer any reason for this omission. An ALJ must formulate a claimant's RFC by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump*, 932 F.3d at 570 (quoting *Varga*, 794 F.3d at 813). Here, Claimant's RFC includes no explicit limitations as a result of her "severe" migraines, and the ALJ fails to articulate reasons for that omission. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[C]ourts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review."). Indeed, there is no logical connection between the evidence concerning Claimant's migraines and the limitations assessed by the ALJ. *See Moore v. Colvin*, 743 F.3d 1118, 1127-28 (7th Cir. 2014) ("The ALJ never related those specific limitations to certain impairments. . . . [T]he reviewing court should not have to speculate as to the basis for the RFC limitations. Nor is the basis otherwise apparent in the record."). If the ALJ believed that Claimant's migraines did not warrant any limitations in her RFC, he was required to say so and articulate the reasons—with accurate citations to the evidence of record—for that belief. The failure to do so is error. *See Crump*, 932 F.3d at 571 (an ALJ's RFC analysis must "say enough" to enable a review of whether the ALJ considered the totality of claimant's limitations).

Second, the ALJ's assertion that "medications and treatment have been relatively effective in controlling the claimant's symptoms" is demonstrably false. Over the years, Claimant was prescribed amitriptyline, Cymbalta, and topiramate to help with her migraines. However,

8

amitriptyline caused suicidal ideation, [Dkt. 18-7 at 372; Dkt. 18-8 at 47, 117]; duloxetine (Cymbalta) caused "horrific" and "intolerable" nightmares, [Dkt. 18-8 at 47, 117]; and topiramate also caused suicidal ideation, [Dkt. 18-8 at 117]. Dr. Templeton prescribed sumatriptan (Imitrex) and naproxen (Naprosyn) in February 2019. [Dkt. 18-7 at 375-76.] Sumatriptan/Imitrex helped with the migraines by shortening their length, *id.* at 410, but they still occurred "about twice a week" and there was no change in Claimant's chronic symptoms. [Dkt. 18-8 at 47.] Further, Claimant testified that her insurance only pays for nine sumatriptan/Imitrex tablets each month, so she does not take them as often as she needs. [Dkt. 18-2 at 47.] Indeed, Dr. Templeton noted that Claimant "gets 15 migraines per month, and therefore is not able to treat all of them" with sumatriptan/Imitrex. [Dkt. 18-8 at 117.] Thus, even though sumatriptan/Imitrex was partially effective at easing Claimant's migraines, the evidence shows that she was not able to consistently take it due to insurance issues.

      Moreover, Dr. Templeton referred Claimant to the Botox Clinic because she "has tried antidepressants and antiepileptics without benefit," and noted that, since "[s]he does have some difficulty with low blood pressure and syncope[,] I would rather avoid using antihypertensive medication for migraine prophylaxis." [Dkt. 18-8 at 119.] Claimant received Botox injections in October 2019 and February 2020. *Id.* at 124, 230. Botox lessened the frequency and intensity of the migraines, although they still occurred about 12 times per month. *Id.* at 230, 232. In fact, Dr. East noted that Claimant "can feel the [B]otox wearing off about 2-3 weeks before her next scheduled appointment." *Id.* at 232-33. And although Claimant also took over-the-counter medications in an attempt to alleviate the migraines, she testified that NSAIDs "usually made me throw up after about 30 minutes." [Dkt. 18-2 at 57.] While not required to mention every piece of evidence, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot

simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). The ALJ failed to fulfill that obligation here.

ALJ Turner's failure to accurately consider Claimant's severe migraines or account for related limitations is especially problematic since, as Claimant underscores, the frequency and intensity of Claimant's migraines appear to be independently disabling in light of the VE's testimony in this case. On remand, the ALJ shall be sure to properly consider whether any limitations are necessitated by Claimant's migraines, take care not to cherry-pick evidence, and explain the reasoning behind his ultimate determination on this issue.

### B. The ALJ Erroneously Relied on Inapplicable Regulations to Reject the Consultative Opinion of Dr. Sprinkle

Next, Claimant argues that ALJ Turner failed to appropriately weigh the consultative examining psychologist's opinion. [Dkt. 25 at 12.]

On March 26, 2019, consultative examiner Melissa Sprinkle, Psy.D., HSPP, completed an Adult Mental Status Examination. [Dkt. 18-7 at 436.] In finding that Claimant's "psychiatric symptoms are impacting her daily functioning, quality of life, and social functioning," Dr. Sprinkle diagnosed Claimant with PTSD; major depressive disorder, recurrent, severe; and generalized anxiety disorder. *Id.* at 441. Dr. Sprinkle provided the following Medical Source Statement:

> The results from this evaluation suggest the claimant can follow directions and process information. Although the claimant reports memory problems, the MSE failed to reveal concerns. Overall, her reported memory problems are thought to be mild to moderate. Her mental calculation ability is intact. Her fund of general information and analytical skills are considered adequate. Her conceptual ability, judgment, and insight are considered adequate. The claimant's attention and concentration are also adequate. She can track and transition in conversation. Given her psychiatric symptoms, she may lack the energy to work. **Although it is believed the claimant demonstrates the ability to respond appropriately to changes in**

10

> **her work environment and perform daily and work activities, it is believed at this time, she would lack the motivation to maintain gainful employment.**

Id. at 441 (emphasis added).

In his decision, ALJ Turner found "the first part of Dr. Sprinkle's opinion generally persuasive, but her opinion regarding the claimant's ability to maintain employment not persuasive." [Dkt. 18-2 at 21.] He explained:

> Under 20 CFR 404.1527(d) and 416.927(d), some issues are not medical issues regarding the nature and severity of an individual's impairments but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability. This includes whether an individual is "disabled" under the Act, and the regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner. As to the first part of Dr. Sprinkle's opinion, the mild limitations given are supported by the results of her own exam, which was generally unremarkable. They are also consistent with other evidence in the record, including the opinions of the State agency psychological consultant, other generally unremarkable MSE results, and the claimant's admission in her hearing that her symptoms had improved (Exs. 4A, 5A, 8A-11A, 3F, 13F, 12F).

Id.

Claimant correctly highlights that, in rejecting the latter part of Dr. Sprinkle's opinion, the ALJ relies on regulations that do not apply to this case. It is true that 20 CFR § 404.1527(d) and 20 CFR § 416.927(d) provide that opinions about whether a claimant is disabled are "reserved to the Commissioner." However, those regulations apply only to claims filed prior to March 27, 2017; Claimant filed her disability applications in May 2018. In fact, the language regarding issues that are "reserved to the Commissioner" is entirely eliminated from the regulations applicable to claims filed on or after March 27, 2017. See 20 CFR § 404.1520c; 20 CFR § 416.920c. Accordingly, the ALJ erred by basing his rejection of Dr. Sprinkle's opinion "on incorrect legal standards." Martin, 950 F.3d at 373. Rather, the updated regulations focus on evaluating medical opinions for persuasiveness, supportability, and consistency. 20 CFR §

11

404.1520c(a); *see* 20 CFR 404.1513(a)(2) (defining a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s)," including your ability to perform physical and mental demands of work activities"). ALJ Turner was therefore required to "explain how [he] considered the supportability and consistency" of Dr. Sprinkle's opinion. 20 CFR § 404.1520c(b)(2). If he found that Dr. Sprinkle's report was "inadequate or incomplete," he was further required to "contact the medical source who performed the consultative examination, give an explanation of [his] evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report." 20 CFR § 404.1519p(b). The ALJ's failure to do so is reversible error.

Moreover, even if the old regulations were applicable to Claimant's disability application, Dr. Sprinkle's statement that she believes Claimant "would lack the motivation to maintain gainful employment" is not an opinion on the ultimate issue of whether Claimant is disabled. Instead, it is an informed finding regarding Claimant's ability to meet the mental demands of competitive employment. *See* 20 CFR 404.1513(a)(2). The ALJ was required to consider this evidence.

The Commissioner's response misses the mark, arguing that Claimant "fails to show harmful error based on the ALJ's citation of 20 CFR § 404.1527." [Dkt. 26 at 8.] Not so. In any case, the harm is obvious: the ALJ uses language that simply does not exist in the context of this case to reject an insightful medical opinion—from the agency's own consultant, nonetheless—that is supported by evidence. ALJs are required to base their decision on the correct legal standards, and the failure to do so is a clear violation of their duty. On remand, the ALJ shall take care to weigh the medical opinions under the correct legal standards provided in 20 CFR § 404.1520c and 20 CFR § 416.920c.

### C. The ALJ Erred in His Assessment of Claimant's Subjective Symptoms

Finally, Claimant argues that ALJ Turner erred in his assessment of Claimant's subjective symptoms. [Dkt. 25 at 15.] Specifically, Claimant asserts that the ALJ made inappropriate references from her activities of daily living—some of which are factually incorrect.[4] The Commissioner responds, unpersuasively, that the ALJ's subjective symptom evaluation was not patently wrong. [Dkt. 26 at 11.]

Pursuant to Social Security Ruling 16-3p, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *3. Once established, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*; 20 CFR § 404.1529(c)(1).[5] The ALJ must then consider the claimant's alleged symptoms in light of her daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to

---

[4] For example, the ALJ, without citation, stated that "[t]he claimant reported that she cooks, cleans, takes care of her two minor children, spends time with her family, and shops in stores." [Dkt. 18-2 at 20.] As laid out below, most of this statement is a mischaracterization of Claimant's testimony. Most importantly, however, Claimant does not have any children, let alone two that she cares for.

[5] Social Security Ruling 16-3p, which rescinded Social Security Ruling 96-7p on March 28, 2016, requires that the ALJ assess a claimant's subjective symptoms, but not her *credibility*. SSR 16-3p, 2017 WL 5180304, at *2. The "change in wording is meant to clarify that [ALJs] aren't in the business of impeaching claimants' character; obviously [ALJs] will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." Cole v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original); *see also* Hall v. Colvin, 778 F.3d 688, 691 (7th Cir. 2015) (noting that an ALJ erred in "her belief that complaints of pain, to be credible, must be confirmed by diagnostic tests").

relieve pain. 20 CFR § 404.1529(c)(3). This determination is generally deferential unless "if, after examining the ALJ's reasons for discrediting testimony, we conclude that the finding is patently wrong." *Larson v. Astrue*, 615 F.3d 744, at 751 (7th Cir. 2010). The ALJ's subjective symptom evaluation may be patently wrong where he fails to "'build an accurate and logical bridge between the evidence and the result.'" *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citing *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). Simply put, an ALJ "must competently explain an adverse-credibility finding with specific reasons supported by the record." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (citation and internal quotation marks omitted).

Regarding physical impairments, Claimant testified, "I frequently have pain in my lower left side of my abdomen" that "feels like somebody is grabbing a hold of my intestines and twisting them." [Dkt. 18-2 at 44.] She further testified to "pain and stiffness in both hands," fainting spells "once or twice a week," and, as detailed above, migraines "about two-to-four times a week." *Id.* at 44-45, 49, 55. When she has a migraine, she is unable to take care of herself; she cannot drive and requires rest, darkness, and quiet. *Id.* at 58. Claimant also testified that her lower extremities swell "regularly." *Id.* at 59. She explained, "I start the day off and I have, you know, fairly slim ankles and calves and then by the end of the day . . . it just swells up and my feet and legs get very red, especially my toes." *Id.* This requires resting with her feet propped up "because it means that I'm more likely to faint." *Id.* at 59-60. Regarding her hand pain and stiffness, Claimant explained,

> I'm not sure what the cause behind it is at the moment but it's like lightning just going down my hands like somebody just electrocuted me. And it'll just, like, sometimes it's just a random finger and sometimes it's the entire hand. And it causes me to drop things. It made it very difficult. I was in school to be a sign language interpreter prior to becoming ill. I had to give that up entirely because I could—you

would have to be able to do very crisp, understandable signs and I couldn't do it anymore because my hands were hurting too much, and my fingers were too stiff.

*Id.* at 60. She also "used to be really into online gaming," but had to stop that, too, because her "hands hurt too much" and her reflexes are worse. *Id.* at 62.

Regarding mental impairments, Claimant testified she has suffered from depression most of her life, generalized anxiety since middle school, and complex PTSD since 2015. *Id.* at 52. Her anxiety is "really bad" so that "[p]eople yelling at me makes me nervous and upset and I shut down." *Id.* at 44. She testified that her depression and PTSD "have gotten significantly worse over the years," and that she has been fired from jobs due to calling off work because of her depression. *Id.* at 53. Claimant stopped taking mental health medication because it caused suicidal ideation, and testified that she has been "doing better" now that she is not taking any. *Id.* at 54.

Regarding daily living, Claimant testified that she lives in a ground-floor apartment with her roommate and her cat, Feathers, although Claimant's roommate is the one to feed Feathers and tend to her litter box. [Dkt. 18-2 at 43; Dkt. 18-6 at 47.] Indeed, Claimant testified that she is "completely dependent" on her roommate. [Dkt. 18-6 at 53.] In a November 2018 function report, Claimant stated that her conditions affect her physical functioning because she is "always in pain and moving makes it worse," and that "[I] get dizzy when I stand, bend, or squat and my hands are hard to move." *Id.* at 51. She reported that her impairments limit her ability to wear anything but pull-on clothes without buttons or straps, and limit her ability to bathe daily because she is "worried about falling." *Id.* at 47; *cf.* [Dkt. 18-7 at 437-38] (consultative psychologist's Adult Mental Status Examination, stating Claimant "showers 2-3 times per week, changes her clothes 2-3 times per week"). Claimant "used to cook great meals," but is now unable to stand for long enough, so she mainly prepares frozen meals, cereal, or leftovers. [Dkt. 18-6 at 48.] In fact,

she needs to "keep a stool nearby to lean/sit on." *Id.* at 48. Once or twice a month, Claimant will load or unload the dishwasher, but this can take anywhere from 30 minutes to two hours. *Id.* at 48; *see* [Dkt. 18-7 at 437-38] (consultative psychologist's Adult Mental Status Examination, stating Claimant "states she cannot physically cook, clean, wash dishes, or wash laundry," and that her "roommate is responsible for most meals and household chores"). Claimant stated that, before her illness onset, she enjoyed "knitting, jewelry making, sewing, cooking, hiking, playing video games, reading, drawing, writing, and baking," but now lacks "the energy, concentration, or dexterity to do any of them." [Dkt. 18-6 at 50.] Further, she does not handle stress well: "it amplifies my pain, gives me anxiety attacks, and causes severe abdominal pain." *Id.* at 52. Claimant states she is "afraid to leave my house" and only drives short distances when necessary. *Id.*; *cf.* [Dkt. 18-7 at 438] (consultative psychologist's Adult Mental Status Examination, stating Claimant "can drive, but prefers not to, as she sometimes faints"). Claimant does some light shopping two-to-three times per month, but either uses an electric scooter if shopping in-store or uses curbside pickup. [Dkt. 18-6 at 49; Dkt. 18-2 at 51.] Claimant lamented, "I cannot work like this, I can barely live like this." [Dkt. 18-6 at 53.]

In addressing Claimant's subjective symptoms, the ALJ regurgitating the following boilerplate language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

[Dkt. 18-2 at 24.] However, the ALJ does not point to the inconsistencies he claims exist between Claimant's subjective statements and the medical evidence, and the Court is unable to locate any after reviewing the entire record. Moreover, "[t]estimony of severe pain," as Claimant

16

has alleged here, "cannot be disregarded simply because it is not supported by objective medical evidence." *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016).

The ALJ continued:

> The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. The claimant indicated that she can generally care for personal care needs, prepares simple meals such as frozen dinners, does light household chores such as dishwashing, can and does drive short distances, goes shopping in stores for a few items, and spends time with her roommate watching television (Ex. 7E). In her hearing, the claimant noted that she cared for a pet cat. She also indicated that she uses social media up to a half hour at a time.

[Dkt. 18-2 at 24-24.] However, none of the activities cited by the ALJ support the ALJ's determination that Claimant was less limited than alleged and, as such, are not adequate reasons to reject Claimant's subjective symptoms. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) ("the ALJ did not explain why [performing daily activities] was inconsistent with [the claimant's] description of her pain and limited mobility"). The Seventh Circuit has routinely admonished that "[t]he 'sporadic performance [of household chores] does not establish that a person is capable of engaging in substantial gainful activity.'" *Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014) (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993)); *see Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) ("[M]inimal daily activities, such as those in issue, do not establish that a person is capable of engaging in substantial physical activity."); *see also Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (the ability to perform "activities of daily living," such as the ability to "drive and shop," does not undermine an allegation of disability, especially where the claimant "testified that she had one or two good days each week" during which those activities may be concentrated). Indeed, if the ALJ means, as his skeletal rationale appears to suggest, that in order to be disabled a person must be incapable of having a pet, watching television, and using social media, the flaws in this reasoning are as obvious as

they are illogical. Moreover, as detailed above, Claimant performs these minimal daily activities with significant assistance and is often limited by pain in doing so. See *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (error for the ALJ to ignore the claimant's "qualifications as to *how* he carried out those activities") (emphasis in original).

Ultimately, the ALJ's rejection of Claimant's subjective symptoms is not grounded in substantial evidence. "[W]e cannot uphold a decision by an administrative agency . . . if . . . the reasons given . . . do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). ALJ Turner's decision must therefore be reversed on these grounds, too. On remand, the ALJ shall properly evaluate Claimant's subjective symptoms as required by SSR 16-3p, and shall not reject Claimant's statements based on her engagement in minimal, modified activities of daily living.

### V.   Conclusion

For the reasons set forth above, the Commissioner's decision is **REVERSED** and **REMANDED for further proceedings consistent with this Order**.

SO ORDERED.

Dated:  5 MAY 2022

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.